UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __ 10/31/2017 __

NEGDA RIVERA,

                      **Plaintiff,**

           -against-

**NANCY BERRYHILL, Acting Commissioner
of Social Security,**

                      **Defendant.**

-----------------------------------------------------------------X

**16-CV-08874 (LGS)(SN)**

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE LORNA G. SCHOFIELD:**

      Negda Rivera seeks judicial review of the Commissioner of Social Security's denial of
her application for disability insurance benefits under the Social Security Act (the "Act"). See 42
U.S.C. § 405(g). Rivera claims that her impairments—right rotator cuff surgery, right shoulder
degenerative joint disease, left arm and elbow problems, right carpal-tunnel problems, asthma,
obesity, and depression and anxiety disorder—prevent her from working in any capacity. An
Administrative Law Judge ("ALJ") determined that the medical evidence did not support
Rivera's account of the severity of her symptoms, rejected the treating sources' opinions of total
functional disability, and credited the opinions of consultative examiners indicating she could
work within specified limitations. The ALJ concluded that Rivera's physical impairments did not
prevent her from performing light work, including occasional lifting overhead, pushing, pulling,
grasping, and handling with the upper right extremity and her dominant, right hand.

      Rivera moved for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil
Procedure, and the Commissioner cross-moved for judgment on the pleadings under Rule 12(c).

I conclude that the ALJ's application of the treating physician rule, reliance on the vocational expert's findings, and ultimate disability determination were supported by substantial evidence and free from legal error. Accordingly, I recommend granting judgment in favor of the Commissioner and denying Rivera's motion.

## BACKGROUND

### I.      The Administrative Record

On July 18, 2013, Rivera filed a Title II application for disability insurance benefits, alleging a disability onset of November 14, 2012. See 20 C.F.R. Part 404. The agency denied her application, and Rivera requested a hearing. Rivera appeared with counsel at the hearing before ALJ Joani Sedaca on January 14, 2015. The ALJ rendered a decision on March 3, 2015, finding that Rivera was not disabled. This decision became the Commissioner's final decision when the Appeals Council denied review of the ALJ's decision on September 23, 2016.

#### A.  Rivera's Testimony and Background

At the time of the hearing before the ALJ, Rivera was 47 years old, 5'6", and weighed 240 pounds. Rivera testified that she injured her right hand, wrist, and shoulder on October 25, 2012, when she was trying to pull a heavy file out of a filing cabinet at her previous job as a housing assistant. Although she could not lift her right arm above shoulder level, reach overhead, or lift two pounds with her right hand, she had "very good" results from a rotator cuff repair operation performed in July 2013. See Administrative Record ("AR") at 72. She received physical therapy for both her right upper extremity and her left arm. She had pain in the left arm but could lift one pound with the left hand.

As of January 14, 2015, Rivera was enrolled in graduate school and was four months away from completing a Master's degree program in social work. She was able to attend some of

the classes despite her physical impairments. Although her classes required typing, her hands became numb after 20 minutes of typing and she recorded the information instead. Otherwise, in terms of activities of daily life, Rivera was able to bathe, groom, and dress herself (though she had trouble putting on a heavy coat). She could do some cooking, light housekeeping, and shopping. She was able to take public transportation. She lived with her 17-year-old daughter.

### B. Medical History

#### 1. Treating Sources

##### a) Dr. Lissa Goldstein

Rivera injured her right hand, wrist, and shoulder on October 25, 2012, and was treated by her primary care physician, Dr. Goldstein, from November 8, 2012, to September 3, 2013. Rivera rated the pain in her right arm and shoulder as a four out of a five-point scale. But a physical examination performed on December 20, 2012, revealed no tenderness, a good range of motion in her right shoulder, and full (5/5) strength. See AR at 378.

X-rays of Rivera's right shoulder taken on December 4, 2012, showed no fracture. At a follow-up appointment on January 8, 2013, Rivera was given a painkiller for her right hand, which "helped," and she was referred to a hand specialist. Id. at 372.

##### b) Dr. Steven Touliopoulos

From January 24 to July 18, 2013, Rivera sought treatment from orthopedic surgeon Dr. Touliopoulos for her right shoulder injury. In February 2013, Dr. Touliopoulos observed pain, tenderness, and limitation in range of motion in Rivera's right shoulder, elbow, and wrist. Rivera was unable "to lift her right arm above shoulder level," "to do overhead or repetitive activities," and "to lift anything of even a light weight." AR at 355. He concluded that her impairments rendered Rivera "totally disabled from all work due to injuries sustained in the accident," and

that "[a]ll activities of daily living have been adversely affected due to injuries sustained to her shoulder." Id. at 303-09.

On July 18, 2013, Dr. Touliopoulos performed surgery to correct Rivera's right-shoulder instability with impingement syndrome and partial rotator cuff tendon tears. See id. at 310–12. In a follow-up appointment on November 15, 2013, Dr. Touliopoulos noted that Rivera had some difficulty raising her arm but was "overall improving" and "progressing well at this time." Id. at 512. He did not test the range of motion in her shoulder because of the recent surgery. She was to continue with physical therapy, home exercise, and anti-inflammatory medication. Despite an absence of "gross sign of shoulder instability," Dr. Touliopoulos concluded that Rivera remained "totally disabled from her work due to injuries sustained in the accident." Id.

### c) Dr. Douglas A. Schwartz

Rivera presented to Dr. Schwartz, a specialist in physical medicine and rehabilitation, with post-operative right-shoulder pain, stiffness, swelling, and a limited ability to move her right arm above shoulder level. His examinations from January 2013 to June 2014 revealed a reduced but gradually increasing range of motion in the right shoulder, nearly full strength in her right biceps and triceps, and 4/5 overall right hand grip strength. See AR at 442, 444, 446, 448, 450, 452. Moreover, Rivera was able to dress and undress independently, feed herself, and take care of grooming and personal hygiene. See id. at 350, 442, 487.

Dr. Schwartz diagnosed Rivera with right shoulder, elbow, and wrist derangement. He opined that she was "totally disabled from work as a housing assistant for the New York City Housing Authority or in any other work capacity since November 14, 2012." See id. at 442, 444, 446, 448, 450, 452. Dr. Schwartz also recommended that she (1) refrain from lifting/carrying and pushing/pulling 5-10 pounds; (2) refrain from using her right arm at/or below shoulder level as

well as reaching overhead in a repetitive manner; (3) use her right arm only occasionally, as needed; and (4) sit/stand for 1-2 hours and with frequent breaks. See id. at 445, 447, 449, 451, 453. But, despite his finding of total disability as a housing assistant, Dr. Rivera noted repeatedly that Rivera was "currently attending graduate school classes" and "she may attempt to return to work in a full-time, light-duty capacity, sedentary position." Id.

At Rivera's next appointment with Dr. Schwartz on August 15, 2014, she presented with residual pain and stiffness in her right shoulder. Upon examination, there was pain in her right shoulder upon palpation but the shoulder's range of motion had increased. Dr. Schwartz reiterated his opinion that Rivera was "totally disabled" from working as a housing assistant, which entailed "the use of her right arm for lifting, carrying and opening and closing heavy file cabinets, and excessive computer keyboard typing activities." Id. at 487. He also repeated his recommendation that she refrain from lifting her right arm at or below shoulder-level as well as reaching overhead in a repetitive manner. Again, despite his assessment of total disability, Dr. Schwartz mentioned that Rivera was "[s]till attending graduate school classes, 2 days per week, 1.5 hours per day." Id.

During a follow-up appointment on August 22, 2014, Dr. Schwartz opined that Rivera could return to work with the following limitations: bending/twisting, lifting, sitting, standing, kneeling, and other "sedentary work." Id. at 492. He reiterated this conclusion on November 24, 2014. See id. at 620.

On December 27, 2014, according to Dr. Schwartz, Rivera had a 75% temporary impairment for purposes of workers' compensation. Moreover, Rivera could return to work so long as it did not require bending or twisting, climbing stairs or ladders, kneeling, lifting, sitting, standing, and operating heavy equipment or motor vehicles.

### d) Dr. Charles DeMarco

On January 14, 2014, Dr. Charles DeMarco, an orthopedist who worked with Dr. Touliopoulos, issued a follow-up orthopedic evaluation. After the July 2013 surgery, Rivera's symptoms of soreness, stiffness, and discomfort had "overall improved" and the "pain and dysfunction in the right shoulder and range of motion" were "improving" as well. AR at 460. She reported continued difficulty in raising her right arm. See id. On examination, Dr. DeMarco noted that Rivera "forward flexes to about 135 degrees, abducts to 110 degrees, and internally rotates to the low lumbar area," and that strength in the rotator cuff "remains diminished." Id. Dr. DeMarco stressed to Rivera the "extreme importance" of continuing physical therapy. Id. He concluded that she "currently remains totally disabled at this time." Id.

At a follow-up appointment on July 25, 2014, his examination findings remained unchanged from those of January 14, 2014, except that the range of motion in Rivera's right shoulder had improved. See id. at 466. Dr. DeMarco reported that her condition was "overall improving" with continued difficulty raising her arm. Id. Furthermore, Rivera had "reached maximum medical improvement with respect to the right shoulder." Id.

Rivera next met with Dr. DeMarco on September 4, 2014. She continued to have some limitation in her right shoulder's range of motion and diminished rotator cuff strength.

### e) Dr. Natalie Hinchcliffe

Rivera presented to Dr. Hinchcliffe, an osteopath, on November 4, 2014, reporting that medication was helping her right-shoulder pain but that she was now experiencing pain in her left arm. Dr. Hinchcliffe assessed left forearm tenderness, no pain to palpation, no nerve pain with pressure at the elbow, and full strength. See AR at 562.

### 2. Consultative Examinations

#### a) Dr. Alan J. Zimmerman

On April 4, 2013, Dr. Zimmerman provided an orthopedic Independent Medical Examination in connection with Rivera's workers' compensation claim. He assessed a right-shoulder contusion that was resolved and observed normal results. According to Dr. Zimmerman, Rivera was "able to resume her preinjury occupation as an office worker without restriction at this time." AR at 325.

#### b) Dr. David Guttman

Dr. Guttman completed a Federation Employment & Guidance Service ("FEGS") physical examination for right shoulder and wrist pain on May 21, 2013, which showed normal findings and a nearly full (4/5) right-hand grasp but decreased range of movement in Rivera's right shoulder. Dr. Guttman opined that Rivera would require employment accommodations for limited grasping, lifting, and reaching. See AR at 266.

#### c) Dr. Ted Woods

Dr. Woods performed a consultative examination of Rivera in connection with her claim for Social Security disability benefits on October 8, 2013. Rivera presented with "stiff" "10/10" pain in her right shoulder that radiated down to her arms and into her hands. AR at 390. She also complained of asthma, for which she was previously hospitalized. Rivera was able to cook once or twice a week with her daughter's help, clean and go shopping once per week, and do laundry once per month. She mentioned some difficulty with showering, dressing, "combing her hair, reaching behind, and putting her bra on." AR at 391. At the time of the examination, Rivera was 5'4" and 248 pounds (obese). Dr. Woods noted that she required help tying and untying her gown in the back but needed no help getting on and off the examination table and was able to

rise from a chair without difficulty. Rivera also had full (5/5) strength in her upper extremities and no muscle atrophy.

According to Dr. Woods, Rivera's prognosis was "good." Id. at 392. Dexterity in her hands and fingers were intact and her grip strength was "5/5 bilaterally." Id. at 393. Dr. Woods assessed only a moderate limitation for overhead lifting with the right arm and indicated that Rivera should avoid smoke, dust, and other known respiratory irritants. See id. at 393.

### d) Dr. A. Hausknecht

Dr. A. Hausknecht examined Rivera on March 18, 2014, in connection with her claim for workers' compensation. His examination revealed pain, numbness, and weakness in Rivera's right hand and wrist but no weakness and full motor strength in the rest of her upper and lower extremities. Rivera had no muscle spasm, no muscle atrophy, and no discrete trigger points upon deep-muscle palpation. Dr. Hausknecht also observed an unrestricted range of motion in "all directions of movement." AR at 591. Dr. Hausknecht ruled out neuropathy, diagnosed Rivera with arthropathy in her right wrist, and concluded that she had a "temporary total disability from her prior occupation as a housing specialist." Id. On April 1, 2014, Dr. Hausknecht opined that Rivera had a temporary total disability from her prior occupation as a housing specialist for purposes of workers' compensation. See id. at 588.

### e) Diagnostic Imaging Results

A January 24, 2013 MRI of the right wrist showed tendinitis,[1] mild extensor digitorum tenosynovitis,[2] and pisotriquetral joint effusion.[3] An MRI of the right elbow, taken the same date, showed unremarkable findings. A February 6, 2013 MRI of the right shoulder revealed

---

[1] Tendinitis is an inflammation or irritation of a tendon.
[2] Tenosynovitis is inflammation of a tendon, often developing after degeneration. Symptoms include pain with motion and tenderness with palpation.
[3] Joint effusion is an abnormal accumulation of fluid in or around a joint.

"small partial-thickness rotator cuff tears involving the distal subscapularis and distal supraspinatus tendons with underlying supraspinatus tendinosis" and "subacromial-subdeltoid bursitis." AR at 399–402. That same month, an electromyography ("EMG") of the right upper extremity revealed abnormal findings.

After the July 2013 surgery, an extremity nerve conduction ("NCV") and EMG study of Rivera's right extremity taken on April 1, 2014, showed unremarkable results. See AR at 410. A November 2014 x-ray of Rivera's left elbow showed no abnormalities. See id. at 582.

### 3. Vocational Expert

At the January 14, 2015 administrative hearing, vocational expert Lee Feldman classified Rivera's past employment as: (1) case aide, semi-skilled, light work; (2) eligibility worker, skilled, sedentary work; and (3) case worker, skilled, sedentary work. The ALJ presented the vocational expert with a hypothetical claimant with the following characteristics: an individual of Rivera's age, education, and work experience, who had the capacity to perform light work and could occasionally lift overhead with the right arm, occasionally push and pull with the right arm, and occasionally grasp and handle with the right dominant hand. See AR at 102–03.

The vocational expert testified that such an individual could perform Rivera's past work, so long as the left upper extremity had the same limitations as the right upper extremity. See id. at 103–05. According to the vocational expert, no jobs were available if the claimant had to "be off task more than 10 percent of the time due to the physical issues" or "take unscheduled breaks more than 10 percent of the time." Id. at 104.

## II.    Procedural History

### A.  The Commissioner's Decision

The ALJ determined that Rivera had severe impairments of status-post right rotator cuff surgery, right shoulder degenerative joint disease, and obesity. <u>See</u> AR at 32. The ALJ rejected Rivera's contention that other physical and mental conditions (including asthma, right carpal tunnel syndrome, pain in her left shoulder and arm, mild depression, and anxiety disorder) constituted severe impairments. According to the ALJ, Rivera did not have an impairment or a combination of impairments that met or medically equaled the severity of a listed impairment. The ALJ determined that Rivera had not experienced the requisite extreme loss of function in both upper extremities, and, therefore, her status-post right rotator cuff surgery and right shoulder degenerative joint disease failed to meet or medically equal the severity of a listed impairment.

Based on her review of the record, the ALJ determined that Rivera had the residual functional capacity ("RFC") to perform light work—she could occasionally lift overhead and push/pull with the right arm and occasionally grasp and handle items with the right, dominant hand. The ALJ concluded that Rivera was not "disabled" within the meaning of the Social Security Act, based on her residual functional capacity, age, education, and past work experience. Accordingly, the ALJ denied Rivera's application for disability insurance benefits, finding her not disabled from November 14, 2012 (the date of the alleged onset of disability), through the date of the decision. The Appeals Council denied Rivera's request for a review and the ALJ's decision became the final decision of the Commissioner.

## B. The Federal Action

Rivera seeks review of the Commissioner's decision under 42 U.S.C. § 405(g). First, according to Rivera, the ALJ erred at Step Three in finding that her impairments neither met nor equaled an impairment contained in Listing 1.02B (Major dysfunction of a joint(s) (due to any cause)). Second, Rivera attacks the ALJ's evaluation of the treating source opinion, asserting that the ALJ improperly afforded limited weight to the opinions of her treating physicians. According to Rivera, the ALJ failed to consider properly the effects of her impairments, as articulated by her treating physicians, and to incorporate those limitations into the RFC. Finally, Rivera asserts that the ALJ erred in relying on the vocational expert's findings, which indicated that Rivera was able to perform her past occupation as a case worker. The Commissioner cross-moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) on the ground that the ALJ's decision was supported by substantial evidence and free from legal error.

## DISCUSSION

## I. Standard of Review

A motion for judgment on the pleadings should be granted if it is clear from the pleadings that "the moving party is entitled to judgment as a matter of law." Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am. (UPGWA) & Its Local 537, 47 F.3d 14, 16 (2d Cir. 1995). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The ALJ's disability determination may be set aside if it is not supported by substantial evidence. See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004)

(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Pursuant to 42 U.S.C. § 405(g),

however, the factual findings of the Commissioner are conclusive when they are supported by

substantial evidence. See Rivera v. Harris, 623 F.2d 212, 216 (2d Cir. 1980). "[O]nce an ALJ

finds facts, we can reject those facts only if a reasonable factfinder would have to conclude

otherwise." Brault v. Comm'r of Soc. Sec., 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation

marks and emphasis omitted).

Thus, "in order to accommodate 'limited and meaningful' review by a district court, the

ALJ must clearly state the legal rules he applies and the weight he accords the evidence

considered." Rivera v. Astrue, 10 Civ. 4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21,

2012) (citation omitted). Without doing so, the ALJ deprives the court of the ability to determine

accurately whether his opinion is supported by substantial evidence and free of legal error.

Where the ALJ fails to provide an adequate roadmap for his reasoning, remand is

appropriate. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("[W]e do believe that the

crucial factors in any determination must be set forth with sufficient specificity to enable us to

decide whether the determination is supported by substantial evidence.").

## II.     Definition of Disability

The Social Security Act defines disability as "the inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A determinable

physical or mental impairment is defined as one that "results from anatomical, physiological, or

psychological abnormalities which are demonstrable by medically acceptable clinical and

laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(2)(D). A claimant will be determined to

be disabled only if the impairments are "of such severity that he is not only unable to do his

previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C.

§ 1382c(a)(2)(B).

The Social Security Administration has established a five-step sequential evaluation

process for making disability determinations. See 20 C.F.R. § 404.1520(a)(4). The steps are

followed in sequential order. If it is determined that the claimant is not disabled at a step of the

evaluation process, the evaluation will not progress to the next step. The Court of Appeals has

described the process as follows:

> First, the Commissioner considers whether the claimant is currently
> engaged in substantial gainful activity. Where the claimant is not, the
> Commissioner next considers whether the claimant has a "severe
> impairment" that significantly limits her physical or mental ability to do
> basic work activities. If the claimant suffers such an impairment, the
> third inquiry is whether, based solely on medical evidence, the claimant
> has an impairment that is listed in 20 C.F.R. Pt. 404, subpt. P, app. 1
> [(the "Listings")] . . . . Assuming the claimant does not have a listed
> impairment, the fourth inquiry is whether, despite the claimant's severe
> impairment, he has the residual functional capacity to perform her past
> work. Finally, if the claimant is unable to perform his past work, the
> burden then shifts to the Commissioner to determine whether there is
> other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted). "The Social

Security regulations define residual functional capacity as the most the claimant can still do in a

work setting despite the limitations imposed by [her] impairments." Selian v. Astrue, 708 F.3d

409, 418 (2d Cir. 2013). "The claimant bears the burden of proof in the first four steps of the

sequential inquiry; the Commissioner bears the burden in the last." Selian, 708 F.3d at 418.

**III.      Severity of Medical Impairments**

At Step Two of the sequential evaluation, the ALJ determined that Rivera had severe impairments of status-post right rotator cuff surgery and right shoulder degenerative joint disease. But, at Step Three, the ALJ concluded that those impairments, singly or in combination, neither met nor equaled an impairment contained in Listing 1.02B (Major dysfunction of a joint(s) (due to any cause)). In order for her impairments to meet or equal the criteria in the Listing, Rivera's impairments must match the specific medical criteria for Section 1.02B. See Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Listing 1.02B requires "major dysfunction of a joint due to any cause." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.02B. Specifically, Section 1.02B provides: "Inability to perform fine and gross movements effectively means an extreme loss of function of both upper extremities; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities." Id. at 1.00B2c. Examples of an inability to perform fine and gross movements include "the inability to prepare a simple meal and feed oneself, the inability to take care of personal hygiene, the inability to sort and handle papers or files, and the inability to place files in a file cabinet at or above waist level." Id.

Rivera was able to attend school, type for up to 20 minutes, prepare food so long as it did not require heavy handling, engage in light housecleaning like dusting, shop with her daughter, and take public transportation. At her consultative internal medicine examination with Dr. Woods in October 2013, she reported being able to cook once or twice a week (with her daughter's help), clean once a week, and do laundry once a month. See AR at 391. She also indicated at various appointments in June 2014, August 2014, and October 2014, that she could independently dress, undress, feed, groom, and take care of her personal hygiene. Although

Rivera informed Dr. Woods that dressing herself was "slow" and that she needed help with "combing her hair, reaching behind, and putting her bra on," id., such difficulties do not rise to a total inability to perform fine and gross movements or "an extreme loss of both upper extremities." 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.00B2c. Accordingly, the ALJ correctly concluded that because "there is no evidence of record to indicate that the claimant has experienced the type of extreme loss of function in both upper extremities that is required by the Regulations, her status-post right rotator cuff surgery and right shoulder degenerative joint disease fail to meet or medically equal listing 1.02B." AR at 37.

## IV.    Residual Functional Capacity

The ALJ has the responsibility to determine a claimant's RFC based on the relevant medical evidence in the record. See 20 C.F.R. §§ 404.1527(d)(2), 404.1545(a), 404.1546(c). Rivera must demonstrate that her impairments resulted in greater limitations than those already included in the ALJ's RFC. See 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. §§ 404.1512(c), 404.1545(a)(3); Bowen, 482 U.S. at 146 n.5 (plaintiff retains the burden of proof through Step Four of the sequential evaluation).

The ALJ determined that Rivera had the RFC to occasionally lift overhead with the right arm, occasionally push and/or pull with the right arm, and occasionally grasp and handle with the dominant, right hand. Rivera argues that the ALJ failed to: (1) weigh the treating physicians' opinions of total disability properly and instead credited consultative examiners who determined that she retained some functional capacity; and (2) take into account Rivera's obesity in formulating the RFC. She also contends that the restrictions contained in the RFC "do not adequately address Ms. Rivera's severe limitations, and that Ms. Rivera is unable to perform her

past relevant work or to perform the full range of sedentary work." Pl.'s Mem. of Law at 11
(ECF No. 10).

### A. Treating Source Rule

#### 1. Relevant Law

A treating source's assessment of functional limitations is entitled to controlling weight
so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic
techniques and is not inconsistent with the other substantial evidence in [the] case record." 20
C.F.R. § 404.1527(c)(2). Treating sources "are likely to be the medical professionals most able
to provide a detailed, longitudinal picture" of impairments and may "bring a unique perspective
to the medical evidence that cannot be obtained from the objective medical findings alone or
from reports of individual examinations, such as consultative examinations . . . ." Id. Because
"the treating source is inherently more familiar with a claimant's medical condition than are
other sources," his or her opinion is generally entitled to "some extra weight." Schisler v.
Bowen, 851 F.2d 43, 47 (2d Cir. 1988). But "the less consistent that opinion is with the record as
a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); see
also Halloran, 362 F.3d at 32 (treating source opinion not entitled to controlling weight where it
conflicted with other record evidence).

When the ALJ discredits the opinion of a treating physician, he must follow a structured
evaluative procedure and explain his decision. See Rolon v. Comm'r of Soc. Sec., 994 F. Supp.
2d 496, 506 (S.D.N.Y. 2014). The ALJ must consider: (1) the length of the treatment relationship
and the frequency of the examination; (2) the nature and extent of the treatment relationship; (3)
the evidence that supports the treating physician's report; (4) the consistency of the treating
physician's opinion with the record as a whole; (5) the specialization of the physician in contrast

to the condition being treated; and (6) any other significant factors. See 20 C.F.R.

§ 404.1527(c)(2)–(6); Selian v. Astrue, 708 F.3d 409, 418 (2d Cir. 2013) ("In order to override the opinion of a treating physician . . . the ALJ must explicitly consider [the aforementioned factors].").

When formulating the RFC, the ALC has discretion to "choose between properly submitted medical opinions." Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998); see also Matta v. Astrue, 508 F. App'x 53, 56 (2d Cir. 2013) (the ALJ was entitled to weigh all of the available evidence in reaching an RFC that was consistent with the record as a whole). That is to say, an opinion by a consultative examiner may constitute substantial evidence in support of the RFC. See Petrie v. Astrue, 412 F. App'x 401, 405 (2d Cir. 2011).

## 2. Application to Rivera

First, the ALJ properly assigned limited weight to Dr. Schwartz's opinion of total work disability because the opinion was not supported by the treating physician's own treatment notes. Although Dr. Schwartz opined on a regular basis (from January 26, 2013, to October 10, 2014) that Rivera was totally disabled from any and all work, Dr. Schwartz also noted that she could return to work in a light-duty capacity and sedentary position, as long as she refrained from using her right arm at or above shoulder level, reaching overhead in a repetitive manner, and using her right arm only occasionally, as needed. See AR at 486, 596–603. Second, according to his own treatment notes, Rivera's right shoulder did have some pain upon palpation and a reduced range of motion but there was no mention of a total loss of function. As of August 2014, despite Rivera's complaints of residual pain and stiffness in her right shoulder, Dr. Schwartz observed that her range of motion had increased. See id. at 442, 444, 446, 448, 450, 452 (examinations through June 2014 show gradually increasing right shoulder motion and nearly full right upper

extremity strength). His notes also repeatedly emphasized that she was able to attend graduate school classes once or twice per week for 1.5-2 hours. In September 2014, Dr. Schwartz opined that Rivera could occasionally lift/carry and push/pull up to 10 pounds; engage in simple grasping and fine manipulation; and perform sedentary work. See id. at 486.

Furthermore, Dr. Schwartz's conclusions of total disability conflict with the opinions of Drs. Goldstein, Woods, Guttman, and Zimmerman. Rivera's primary care physician, Dr. Goldstein, noted on December 20, 2012, that, with respect to her right upper extremity, there was a good range of motion with internal and external rotation. See id. at 378. Moreover, at the consultative examination in October 2013, Dr. Woods assessed only a moderate limitation for overhead lifting with the right arm and pronounced a "good" prognosis. AR at 393. Dr. Woods's examination showed full (5/5) strength in her upper and lower extremities, intact hand-and-grip dexterity, and full grip strength. See id. at 392–93. Dr. Woods's assessment of moderate limitations is consistent with the opinion of FEGS internist Dr. Guttman, who concluded, in May 2013, that Rivera would require employment accommodations for grasping, lifting, and reaching, based on similar findings of reduced right shoulder motion and a nearly full (4/5) grip strength. In April 2014, at an examination performed in connection with Rivera's claim for workers' compensation, Dr. Zimmerman observed a resolved right-shoulder contusion but opined that Rivera was "able to resume her preinjury occupation as an office worker without restriction at this time." AR at 325.

Other examination evidence in the record also conflicts with Dr. Schwartz's finding of total functional capacity. In January 2014, Rivera reported to Dr. DeMarco improvement in her overall symptoms of pain, soreness, stiffness, and discomfort, though she still had some difficulty in raising her right arm. See id. at 460. Dr. Hausknecht's examination, performed on

March 18, 2014, disclosed mostly benign findings—an unrestricted range of motion, no weakness, full motor strength in Rivera's extremities; and no muscle spasm, muscle atrophy, or discrete trigger points upon deep-muscle palpation. See id. at 590–91. The NCV/EMG exam of Rivera's right upper extremity, performed on the same date as Dr. Hausknecht's examination, also revealed normal findings. In a follow-up visit with Dr. DeMarco in September 2014, the impingement sign[4] and apprehension test[5] were negative. During an appointment in November 2014 with Dr. Hinchcliffe, Rivera reported that medication helped to reduce the pain in her right shoulder. See id. at 562. Although she mentioned there was pain in her left arm, an examination revealed no pain to palpation, no nerve pain with pressure at elbow, and full strength. See id. At a follow-up January 2015 examination, grip strength was 4/5 on the left and 5/5 on the right, with full (5/5) ranges of extension and flexion bilaterally. See id. at 582.

In addition, the ALJ's failure to recite robotically the analysis set forth in 20 C.F.R. § 404.1527(c) is not reversible error. "Remand is unnecessary" where "application of the correct legal standard could only lead to one conclusion." Zabla v. Astrue, 595 F.3d 402, 409 (2d Cir. 2010) (internal quotation marks omitted). The ALJ specified that "little weight" would be given to Dr. Schwartz's opinions regarding Rivera's physical functioning. AR at 42. The ALJ also noted Dr. Schwartz's specialization as Rivera's physical medicine and rehabilitation provider. See id. at 42–43. Finally, the ALJ stated that, while Dr. Schwartz's opinions would normally be given controlling weight, there was substantial support in the medical record for discounting those opinions. See id. at 43. Accordingly, Dr. Schwartz's conclusion of total functional disability conflicted with his own treatment notes, the opinions of other examiners,

---

[4] The impingement sign test is commonly used during orthopedic examinations to test for shoulder impingement, which occurs when the tendons of the rotator cuff muscles become irritated and inflamed. This can result in pain, weakness, and loss of movement at the shoulder.
[5] The apprehension test checks for a possible torn labrum or anterior instability problem.

and Rivera's own testimony during the relevant period (i.e., she was able to attend classes regularly, complete the curriculum's requirements, cook, clean, and take care of herself).

Second, the ALJ also properly assigned "minimal weight," id. at 43, to the opinions of Rivera's treating orthopedic provider, Dr. Touliopoulos, who concluded that Rivera was totally disabled from work from February 2013 to January 2014. Dr. Touliopoulos's examinations revealed only a reduced range of motion and diminished rotator cuff strength in her right shoulder, not total disability. Dr. Touliopoulos's notes contain other inconsistencies with his conclusion that she was totally disabled. After the July 2013 operation to correct her right-shoulder instability and partial rotator cuff tendon tears, Rivera rated the pain in her right shoulder and arm as "3/5" with no positive right-shoulder findings as of September 2013. See id. at 368. In addition, in November 2013, Dr. Touliopoulos described Rivera's condition as "overall improving" and "progressing well at this time" with "no gross signs of shoulder instability." Id. at 512.

Accordingly, the ALJ correctly applied the treating physician rule and assigned proper weight to the treating source opinions.

**B. Obesity**

Rivera asserts that the ALJ did not sufficiently consider her obesity when formulating the RFC. But the ALJ expressly did so, mooting Rivera's argument:

> The claimant is also obese. On December 20, 2012, the claimant weighed 242 pounds, and her body mass index was determined to be 39.84. Any body mass index between 35.5 and 39.9 is considered to constitute level II obesity. The claimant's weight on September 3, 2013 was 246 pounds, and her body mass index was calculated to be 40.94 pounds. Any body mass index greater than or equal to 40 is deemed to constitute level III or extreme obesity. . . . *In formulating the claimant's residual functional capacity*, however, the undersigned ha *accounted for any functional limitations attributable to the claimant's obesity by restricting her*

*to light exertional work and occasional reaching, pushing, pulling,*
*grasping, and handling with the right upper extremity.*

AR at 41 (emphasis added).

### C. RFC Formulation

Rivera asserts broadly that the restrictions imposed in the ALJ's RFC—that she was

capable of engaging in light work as defined in the Regulations and that she could occasionally

use her right arm and right dominant hand—do not sufficiently address her severe limitations.

The Court finds the ALJ's RFC to be supported by substantial evidence in the medical record.

The RFC incorporates a consistent finding by both Rivera's treating physicians and consultative

examiners that her right arm and right hand would require some accommodation but that she was

able to use them in some capacity.

With respect to the consultative examiners that the ALJ appropriately credited, Dr.

Woods imposed only a moderate limitation for overhead lifting with the right arm and observed

intact hand-and-grip dexterity and full grip strength. Consistent with Dr. Woods's findings, Dr.

Zimmerman opined that Rivera was capable of resuming her preinjury occupation as an office

worker without restriction, and Dr. Guttman simply noted that Rivera would need employment

accommodations for limited grasping, lifting, and reaching.

Additionally, even Rivera's treating physicians, despite their conclusions that she was

totally functionally disabled, allowed for light exertional work so long as limitations in her right

arm and hand could be accommodated. Dr. Schwartz concluded that Rivera was capable of

sitting/standing for one to two hours with frequent breaks as needed; walking for 30 minutes to

one hour (with frequent breaks); occasionally lifting/carrying and pushing/pulling ten pounds;

and engaging in simple grasping and fine manipulation. Dr. Schwartz's assessment that Rivera

could occasionally lift/carry, push/pull, sit and walk with frequent breaks as necessary, and

engage in simple grasping and fine manipulation is sufficiently reflected in the ALJ's RFC. Additionally, after performing surgery in July 2013 to correct Rivera's right-shoulder instability, Dr. Touliopoulos observed no positive right-shoulder findings and an "overall improving" outlook with "no gross sign of shoulder instability." Id. at 512.

## V.  Rivera's Past Work

At Step Four, the ALJ must determine whether, despite the claimant's impairments, she has the RFC to perform her past work. See Jasinski, 341 F.3d at 183–84. After the claimant proves that she cannot return to her previous work, the burden then shifts to the Commissioner to establish, at Step Five, that other work exists in the national and local economies that the claimant could perform, given her RFC, age, education, and past relevant work experience. See 20 C.F.R. § 404.1560(c)(2); Melville v. Apfel, 198 F.3d 45, 51 (2d Cir. 1999). Rivera contends that the ALJ erred in relying on the vocational expert's findings that she was capable of performing her past work and denying her claim at Step Four.

The ALJ first determined that Rivera's past relevant work experience included case aide, eligibility worker, and case worker. The ALJ then incorporated the limitations of the RFC into a hypothetical—i.e., whether an individual of Rivera's age, educational background, and employment history could perform past work as a case aide, eligibility worker, and/or case worker if the individual had the RFC to perform a range of light work as defined in the Regulations and could only occasionally lift overhead with the right arm, occasionally push/pull with the right arm, and occasionally grasp/handle with the dominant, right hand. The vocational expert responded that Rivera could perform her past sedentary work.

Rivera asserts that, at her previous job, she was required to do frequent typing, which her impairments now prevent her from doing. For her graduate school classes, she could type only

for 20 minutes before she had to stop, which interfered with her studies. According to Dr. Schwartz, her past job as a housing assistant involved "excessive computer keyboard typing activities" and that such a large amount of typing would aggravate her impairments. AR at 350.

But there is substantial evidence in the medical record to support the ALJ's denial of Rivera's DIB claim at Step Four. First, although Rivera was diagnosed with bilateral carpal tunnel syndrome in the "early 1990s," she made a "full recovery" during a "brief course of treatment." Id. at 350. Second, consultative examinations revealed unremarkable findings with respect to dexterity, fine manipulation, and grip strength. Dr. Woods observed that Rivera's hand and finger dexterity were intact and that her grip strength was "5/5 bilaterally." Id. at 393. Dr. Zimmerman's April 4, 2013 examination showed bilateral "5/5" strength in both Rivera's wrist extensors and wrist flexors. Id. at 325. Dr. Zimmerman also asserted that a request for electrodiagnostic studies of Rivera's upper extremities should be denied because there was "no evidence of a cubital tunnel syndrome[6]" and "the concept of cervical radiculopathy[7] is creative to say the least and without any basis." Id. Third, diagnostic imaging showed unremarkable findings as well. An MRI of the right elbow indicated that the "common flexor[8] and common extensor tendons[9] are intact and unremarkable," the "radial collateral[10] and ulnar collateral ligaments[11] are intact," and the "lateral ulnar collateral ligament is also intact." Id. at 316. A

[6] Cubital tunnel syndrome involves pressure or stretching of the ulnar nerve, which runs on the inner side of the elbow, and can cause numbness or tingling in the ring and small fingers, pain in the forearm, and weakness in the hand.
[7] Cervical radiculopathy symptoms generally involve pain, weakness or numbness in the areas served by the affected nerve. Pain can be felt in one area only, like the shoulder, or radiate along the entire arm and into the hand and fingers. An individual may feel pins-and-needles tingling, as well as numbness or weakness in the hand, which can affect the ability to grip or lift objects, write, type, or get dressed.
[8] The common flexor tendon attaches to the lower part of the bone of the upper arm, near the elbow joint. It serves as the upper attachment point for the superficial muscles at the front of the forearm.
[9] The common extensor tendon is the upper attachment for the superficial muscles located on the posterior aspect of the forearm.
[10] The radial collateral ligament is a ligament in the elbow on the side of the radius.
[11] The ulnar collateral ligament is a triangular band at the medial aspect of the elbow.

February 25, 2013 EMG study of Rivera's right upper extremity showed only mild median mononeuropathy in her right wrist, or mild right carpal tunnel syndrome.

Accordingly, the ALJ did not err in finding that Rivera was capable of performing past work at Step Four and was therefore not disabled.

## CONCLUSION

For these reasons, I recommend that the Court deny Rivera's motion for summary judgment and grant the Commissioner's cross-motion for judgment on the pleadings.

_____
SARAH NETBURN
United States Magistrate Judge

DATED:      October 31, 2017
            New York, New York

\*            \*            \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lorna G. Schofield at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Schofield. The failure to file these timely objections will

result in a waiver of those objections for purposes of appeal. <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).